ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

Jackson, *ex dem.* The Rector, Church Wardens, &c. of St. George's Church, in the parish of Newburgh ; the Trustees of St. George's Church, in said parish ; the Trustees of the parish of Newburgh ; and Cave Jones, *against* Michael Nestles.

THIS was an action of *ejectment*, for lands in the village of *Newburgh*, in the county of *Orange.* The cause was tried at the *Orange* circuit, before Mr. Justice *Tompkins*, on the 26th *November*, 1806. The lessors of the plaintiff, claimed the premises in question, as parcel of 100 acres of land, belonging to an episcopalian minister, duly inducted, as rector of *St. George's* church in the parish of *Newburgh.*

On the trial, the lessors of the plaintiff, produced in evidence, a grant or charter, from *George* II. dated the 26th *March*, 1752, which recited a petition from *Alexander Colden* and *Richard Albertson*, trustees, and others, proprietors and inhabitants of a tract of land, called the *Newburgh* patent, setting forth, among other things, that letters patent had been granted of a tract of land containing 2,190 acres, within the said patent, to eight palatines, and their families, which letters patent had granted a glebe of 500 acres of the said tract, to two of the said palatines, and their successors for ever, as trustees, for the benefit of a *Lutheran* minister, to have the care of souls of the inhabitants of the said tract of 2,190 acres of land ; that all the said palatine families had sold their several lots to the petitioners, and had removed into the county of *Albany ;* and that after their removal, the male inhabitants of the said tract, above the age of twenty-one years, had met and elected the said *Alexander Colden* and *Richard Albertson*, trustees of the said glebe of land, who took possession thereof ; And further reciting, that the said trustees, with the consent of the proprietors and inhabitants of the said tract, had, by deed, dated the 14th

*In an action of ejectment, on several demises, (one of which was, from the trustees of the parish of New-burgh, elected under an incorporation pursuant to the act of the legislature to provide for the incorporation of religious societies, passed in March,1801,)to recover the possession of 100 acres of land, part of 500 acres, granted by a charter of incorporation, in 1752, for the use of a minister of the church of England, against the tenant claiming to hold under the trustees of the same parish, elected pursuant to an act of the legislature, passed in April, 1803,relative to the said glebe ; it was held,that the lessors of the plaintiff were not entitled to recover the premises against the tenant in possession.*

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

*March*, 1752, surrendered up the said letters patent, so far as it related to the said glebe of 500 acres of land, and the incorporation of the said trustees. The said charter, then constitutes the said *Alexander Colden* and *Richard Albertson*, and their successors, a body corporate, by the name of the " trustees of the parish of *Newburgh*," and " grants and confirms unto the said *Alexander Colden* and *Richard Albertson*, trustees of the parish of *Newburgh* aforesaid, and to their successors forever, to and for the benefit and behoof of a minister of the church of *England*, as by law established, to have the care of souls of the before recited tract of 2,190 acres of land, and of a schoolmaster, to teach and instruct the children of the said inhabitants of the aforesaid tract of 500 acres of land, lying and being in *Ulster* county aforesaid, between the lots no. 5 and 6, and bounded northerly by lot no. 6, now belonging to *John Wendell*, southerly, by lot no. 5, now belonging to the heirs of *James Smith*, deceased, easterly, by *Hudson's* river, and westerly, by lands formerly granted to *John Spratt*." " To have and to hold the aforesaid tract of 500 acres of land and premises, with the hereditaments and appurtenances, unto the said *Alexander Colden* and *Richard Albertson*, as first trustees of the parish of *Newburgh* aforesaid, during their natural lives, and residence on the aforesaid tract of 2,190 acres of land, and to their successors forever. But to and for the proper use, benefit, and behoof of a minister of the church of *England*, as by law established, to have the care of souls of the inhabitants of the aforesaid tract of 2,190 acres of land, and of a schoolmaster to teach and instruct the children of the aforesaid inhabitants, and their executors forever, and to no other use whatsoever : And, for the perpetual preservation and confirmation of the aforesaid trust, and the better improvement of the said tract of 500 acres of land, to and for the uses aforesaid ; We do likewise give and grant, that upon the death, disability or absence of the same *Alexan-*

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

*Jer Colden* and *Richard Albertson*, or either of them, or their successors, it shall and may be lawful to and for all the inhabitants of the aforesaid tract of 2,190 acres of land, being males, and above the age of twenty-one years, to assemble and meet together, at any time or times hereafter, upon some part of the said tract of 500 acres of land, and by majority of voices, to elect and choose other trustee or trustees, in the room and stead of such trustee or trustees, so dying, removing, or otherwise disabled, which trustee or trustees so chosen, hereafter, shall be trustee or trustees of the parish of *Newburgh* aforesaid, to all intents and purposes, as if they had been herein nominated, for the ordering and management of the said 500 acres of land ; And we do hereby further give and grant unto the said *Alexander Colden* and *Richard Albertson*, the present trustees of the parish of *Newburgh*, and their successors, full power and authority, to lease, or grant for any term of years for lives, for ever, 300 acres of the said 500 acres of land, to be laid out in lots of one acre in each lot, reserving the annual rent of 5*s.* for each acre lot, at the least, to be paid to the said trustees, for the use and benefit of such minister and schoolmaster as aforesaid, and that the remaining 200 acres of the said 500 acres of land (after reserving a sufficient quantity for a church and cemetery, or church yard) shall forever hereafter, be and remain for, and as a glebe, for the use of a minister of the church of *England*, as by law established, to have the care of souls of the inhabitants of the said tract of 2,190 acres of land, and of a schoolmaster to teach and instruct the children of the inhabitants of the said tract, in such proportions, as the said trustees shall think meet, proper, and convenient : And that the said trustees, and their successors, forever hereafter, with the consent of the major part of the freeholders, of the aforesaid tract of 2,190 acres of land, being resident thereon, shall and may, from time to time, and as often as the same shall be vacant, call, choose, and present a good and

sufficient minister of the church of *England*, as by law es-tablished, to officiate upon the said glebe, and to have the care of souls of the inhabitants of the aforesaid tract of 2,190 acres of land, and to nominate and appoint a good and sufficient schoolmaster, to teach and instruct the children of the said inhabitants ; Provided always, that such minister shall be instituted and inducted, in such manner as shall be most suitable, and agreeable to our instructions to our governors, of our said province of *New-York*, for the time being : And we do hereby further grant unto the said *Alexander Colden* and *Richard Albertson*, and their successors, trustees of the parish of *Newburgh*, free and full liberty and license, to hold and keep a public fair, upon the said tract of 500 acres of land, on the second *Tuesdays* in *April* and *October*, in every year forever hereafter, where, as well all the inhabitants of the aforesaid tract of 2,190 acres of land, as those of the neighbouring settlements and counties, and all other persons whatsoever, may buy and sell any horses, sheep, neat cattle, or any goods, wares and merchandizes, whatever, without paying any toll, or other fees, for the same."

The lessors of the plaintiff, then proved, that during the time of the said trustees, and a short time after the granting the said charter, 100 acres of the said 500 acres of land, were surveyed and set off for the use of a minister of the church of *England*. A short time, afterwards, Mr. *Watkins*, a minister of the church of *England*, was inducted, agreeably to the charter, and had possession of the 100 acres, as minister, and continued in possession thereof, several years, officiating as minister on the said glebe. Mr. *Sears*, a minister of the church of *England*, was inducted after Mr. *Watkins*, and as his successor, pursuant to the charter, and took possession of the said glebe, and continued in possession of it, officiating as minister, until the commencement of the war, in 1775. During the time that Mr. *Sears* was in possession of the glebe, a house was erected thereon, for the use of the minister. After the war, in 1785 or 1786, Mr. *Spering*, a minis-

ter of the episcopal church, was employed to officiate on the glebe, and continued in possession thereof, until 1793 or 1794.

It was also proved, that the premises in question, and the possession of the defendant, are parcel of the said 100 acres, called the parsonage lot, or glebe. It was admitted, that two freeholders of the said patent, called the *German* patent, being episcopalians, were, on the 4th *November*, 1805, and prior to the demises laid in the declaration, elected trustees of the parish of *Newburgh*, pursuant to a public notice, addressed to all the male inhabitants, of the age of twenty-one years, residing on the tract of land, known by the name of the *German* patent, and belonging to the protestant episcopal church. At the time of the election of the said two trustees, there were no persons residing on the said patent, who claimed to be trustees of the said parish. At the election held, in pursuance of the said notice, a large majority of the inhabitants of the said patent, who assembled to vote, were excluded from voting, because they were not episcopalians, and for that reason only. None but episcopalians, who constituted about one-tenth part of the inhabitants, were allowed to vote at the said election. The trustees so elected, entered on the premises, and, afterwards, the present action was commenced.

It was further proved, that in 1803, *Hugh Walsh* and *Levi Dodge*, as trustees of the parish of *Newburgh*, together with about one-third part of the freeholders and inhabitants of the said *German* patent, presented a petition to the legislature, requesting certain amendments to the said charter. In consequence of this petition, which was publicly known on the patent, the legislature passed an act, on the 6th of *April*, 1803, entitled, " An act to alter and amend the charter of the glebe land in the *German* patent, in the village of *Newburgh* ;" the material part of which is, as follows :

" Whereas a glebe of five hundred acres of land, situate in the town of *Newburgh*, and county of *Orange*, was granted by letters patent, under the great seal of the then

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

province of *New-York*, on the 26th day of *March*, one thousand seven hundred and fifty-two, to *Alexander Colden* and *Richard Albertson*, and their successors, as trustees of the parish of *Newburgh*, and to the inhabitants then living on the *German* patent, for the support of a minister of the church of *England*, as then by law established, and a schoolmaster, to have the care of souls, and the instruction of the children of the inhabitants of the *German* patent : And whereas there now is not, nor has there been for several years last past, any such minister in said village : And whereas *Hugh Walsh* and *Levi Dodge*, trustees of said parish, together with the inhabitants of said patent, have by their petition prayed that the said charter be by law altered and amended, so as to meet their interest and convenience ; Therefore, *Be it enacted, &c.* that it shall and may be lawful for the inhabitants residing on the said *German* patent, who shall have a right to vote at the annual town-meetings, to meet together in the village of *Newburgh*, on the second *Tuesday* of *May* next, at some proper place, to be appointed by any justice of the peace within the said village, and notified to the inhabitants of said patent, at least one week previous to the said second *Tuesday* of *May*, and then and there to choose, by a plurality of votes, three persons, inhabitants of the said patent, to officiate as trustees of the aforesaid glebe, who shall hold their offices for one year, and until others shall be chosen in their stead ; and the said trustees so chosen shall have the like powers to do, and the like duties to perform, as the trustees of the parish of *Newburgh* have heretofore been possessed of and done ; and such justice shall preside at such meeting, and shall declare the persons having the greatest number of votes, as duly chosen trustees; and on every second *Tuesday* in *May*, after the first election of trustees, there shall in like manner be a new election for trustees of the glebe, and the trustees for the time being shall perform the several duties required from said justice, in respect to notifying

the meeting of the inhabitants of said patent, and presiding at such election.

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

II. *And be it further enacted*, that the monies arising from the annual income of the glebe, shall forever hereafter be appropriated solely to the support of schools on said glebe ; that the sum of two hundred dollars of such monies shall be paid on the first *Tuesday* in *May*, in every year, by the trustees of the glebe, to the trustees of the academy of *Newburgh*, who shall apply the said sum of two hundred dollars, solely to the use of schools taught in said academy ; and that the remainder of the money arising from such annual income, shall be paid to the trustees of the other schools which are, or may hereafter be, established on the glebe, in such manner, and in such proportion, as the inhabitants aforesaid, from time to time, shall order and direct. Provided always, that if, at any time hereafter, a minister of the episcopal church shall be inducted on said patent, as nearly in conformity to said charter as may be, then it shall and may be lawful for the said trustees of the glebe to pay annually, for the support of said minister, such proportion of the monies aforesaid, as shall be reasonable, according to the true intent and meaning of said charter."

A majority of the inhabitants on the said patent, elected three trustees, in pursuance of the said act, and these trustees, and the defendant, hold the premises in question. The lessors of the plaintiff further offered to prove, that the persons whose names were recited in the said act of 1803, as trustees, were not of the parish of *Newburgh*, at that time, and that neither the said *Hugh Walsh*, or *Levi Dodge*, nor any persons, as trustees, had ever executed any deed of surrender, before or since the passing of the said act, which testimony was overruled by the judge.

It further appeared in evidence, that *Cave Jones*, a regular clergyman, in communion with the protestant episcopal church, in the state of *New-York*, on the 4th day

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

of *November*, 1805, had been called, chosen and inducted as a minister, to officiate on the said glebe; that he was called and chosen by the said persons claiming to be trustees of the parish of *Newburgh*, together with the consent of all the episcopalians residing on the said patent, and was inducted by the wardens and vestry-men of *St. George's* church, in said parish, (which was admitted to be a religious incorporation, made and created pursuant to the act of the legislature of this state, entitled, " An act to provide for the incorporation of religious societies," passed the 27th *March*, 1801; and was formed on the 4th of *November*, 1803,) by and with the consent of the persons claiming to be trustees of the parish of *Newburgh*, as rector of said church; and that as such rector, he afterwards, and before the commencement of this suit, entered into possession of the glebe house, &c.

The counsel for the defendant then moved, that the lessors of the plaintiff should be called to produce further evidence, or be nonsuited. No further evidence being offered, they were directed to be called and nonsuited.

A motion was made, at the last term, to set aside the nonsuit, on the following grounds: 1. That by the charter of 1752, none but episcopalians were qualified to vote, or were eligible, as trustees of the parish of *Newburgh*. 2. That by the constitution of the state, none but episcopalians could vote for, or be elected, as trustees, under the said charter. 3. That the act of the legislature, altering the charter, was unconstitutional; or if not unconstitutional, it was passed under a misapprehension of the rights and interests of the parties, occasioned by the misrepresentations of those, at whose instance, and for whose benefit the act was passed; and that as there was no surrender of the interest in the said land, the same cannot be affected by the said act. 4. That the episcopalians residing on the said patent, having never joined in the petition for the said act, or acquiesced in, or acted under it, ought not to be affected by it. 5. That the 100 acres, having been set apart for such minister, as the charter di-

rected, when such minister was inducted, the use was executed; and that *Cave Jones*, having been duly inducted as such minister, was entitled to recover the possession, as the successor of the last rector of the said parish. 6. That if *Cave Jones*, as such rector, is not entitled to recover the premises, the trustees of the parish of *New-burgh*, at least, are entitled to the possession.

*Fish*, for the plaintiff. By the charter, or grant of the 26th of *March*, 1752, none but episcopalians, or persons belonging to the church of *England*, were entitled to vote for, or be elected trustees. When all the inhabitants of the tract are mentioned, episcopalians only are intended. It was clearly so understood by the grantees, who set apart 100 acres of the land for the use of an episcopal minister, who continued in possession 20 years. By the 36th section of the constitution of this state, all the royal grants and charters prior to the 14th of *October*, 1775, are expressly confirmed; and by the 38th section of the constitution, the free exercise and enjoyment of religious profession and worship, is declared, without discrimination or preference. The constitution intended to secure to every religious denomination, their property and rights. By the act of the legislature, of the 6th of *April*, 1784,\* all religious denominations are empowered to appoint trustees, who shall be a body corporate, to take care of the temporalities, and transact the affairs of their respective congregations, or societies. By the act to provide for the incorporation of religious societies, passed the 27th of *March*, 1801,† the first section of which relates to protestant episcopal churches, the mode of electing church-wardens and vestry-men, and the qualifications of electors are prescribed. No persons have a right to vote, but such as belong to the same church or congregation.

A large majority of the inhabitants now on the patent, are not episcopalians; and if every male inhabitant, of the age of 21 years, without regard to his religious profession, be allowed to vote, the church may be for ever kept vacant, and the intention of the charter be thereby defeated.

*Margin notes:*

ALBANY, Feb. 1808.

Jackson v. Nestles.

\* 7 *Sess.* ch. 18. *Greenleaf's* ed. of the *Laws of New-York*, vol. 1. p. 71.

† *Revised Laws of N. Y.* vol. 1. p. 336.

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

It would be absurd, to allow persons to vote under the charter, who are interested and disposed to vote in such a way, as to defeat the very object of that charter. If all the inhabitants have a right to vote, and will not vote, for *episcopalians*, then a *mandamus* may be necessary, to compel them to vote for such trustees. In 1803, the inhabitants petitioned the legislature to divest the land, and appropriate it solely to the use of schools. But if the land had once vested in trustees, under the charter, it became vested again in the trustees, elected in 1805 ; and they could do no more than to set it apart, pursuant to the charter, for the use of an episcopal minister and a school.

According to the true and legal construction of the charter, then, none but episcopalians had a right to vote, or if, before the constitution was formed, all the inhabitants of the patent had a right, yet since that time, no persons but such as belong to, or are of the communion of that particular church, have a right to vote, or act in regard to the management of its temporal and religious concerns.

Have the rights of the plaintiff been divested by the act of 1803 ? It can never affect the rights of the episcopal inhabitants, as they did not join in the petition. If it be granted, that the legislature have power to interfere and direct the mode in which the charter-officers are to be elected, it does not follow, that they can take away the property of the grantees. In the preamble to the act, *Hugh Walsh* and *Levi Dodge*, are stated to be trustees, when in fact, they were not trustees. It would be strange and unjust, if mere strangers might, by a petition to the legislature, obtain a grant of the property of others. The legislature had no right to make such a grant ; and if the act has been passed under a mistake, or through misrepresentation, it cannot operate against those who were strangers to the act, and who did not join in the petition.* The land having once vested in the grantees, under the charter, it could not be lawfully taken away from them, without their consent.

* *Jackson* v. *Catlin*, 1 *Johnson*, 253.

*J. Radcliff* and *T. A. Emmet*, contra. The original charter was to certain palatines, who were *German Lutherans*. On their removal from the tract, the remaining inhabitants, being of the church of *England*, or *episcopalians*, met together, elected trustees, surrendered the original patent, and obtained a new charter to them and their successors. If none but persons of the same religious denomination, with those named in the original grant, had a right to vote ; then the *episcopalians*, in 1752, had no right to elect trustees. There is as much ground to object to the charter of 1752, under which the plaintiff claims, as to the act of 1803, under which the defendant holds. The *episcopalians*, in 1752, acted in the same manner towards the *Lutherans*, as the *presbyterians*, in 1803, have acted towards the *episcopalians*. No evidence was offered under the first and second demises ; and the claim of the plaintiff rests on the two last demises. There are two sets of trustees, one of the parish of *Newburgh*, elected pursuant to the charter under which the plaintiff claims ; the other created by the act of 1803.

1. It is said, that none but *episcopalians* have a right to vote for trustees. But the words of the charter are, that all the male inhabitants of the tract, of the age of twenty-one years, are to elect trustees, and that the trustees, with the consent of a majority of the freeholders of the tract, are to call and present a minister, and appoint a schoolmaster. There is nothing in the charter which says, that the persons entitled to vote, shall be *episcopalians*. Admitting the fact, that, at the time the charter was granted, all the inhabitants were *episcopalians*, it would not follow, that the right of voting was to be always confined to persons of that religious denomination ; since it was not to be presumed, that persons of the same religious sect would forever continue on the patent, when it was the well known policy of the parent country to encourage *protestants*, of all denominations, to settle in the colonies. The grant was not solely for a religious object, but for moral and commercial purposes, the support of a

*school*, and the upholding of a *fair* or *market*. In the latter objects, every inhabitant was interested, whatever might be his particular tenets of religion. According to the intent of the charter, at least in respect to a *school* and *fair*, every inhabitant had a right to vote for trustees. If so, the election in 1805, in which none but *episcopalians* were allowed to vote, was illegal.

Again, no minister could be called, without the consent of a majority of the freeholders, on the patent. The trustees, alone, had no power to appoint a minister. But it is said, that if those who are not *episcopalians* are allowed to vote for trustees, or to appoint a minister, the intention of the original grant may be defeated. But the rights of *episcopalians* are not infringed. The trustees would be bound to fulfil the original intent of the charter ; the inconvenience that might result from the necessity of compelling the trustees to act, furnishes no legal objection to the construction of the charter, for which we contend. Whenever a minister of the *episcopal* church is properly inducted, the trustees are bound to appropriate the glebe to his use. This is merely a question of property, not of conscience. No rights of conscience have been violated in this case. Compare it to an *advowson*, or *patronage*. A patron, in *England*, possessing an *advowson*, or right of presentation to a church, may, by common law, be of any religious denomination whatever. A *jew*, if he purchases an estate, to which an *advowson* is annexed, may present. By the statutes of 3 *James* I. c. 5. and of 1 *William* and *Mary*, sess. 1. c. 26. popish recusants convict, and persons who will not subscribe to the declaration, mentioned in the act against *papists*, are disabled from presenting to a benefice ; but persons of every other religious sect, possessing an *advowson*, may present.* There is no ground for the inference, in this case, that because the inhabitants of the patent, at the time the grant was made, were all *episcopalians*, that, in the lapse of time, other inhabitants, who were not *episcopalians*, might not vote in the choice of trustees. Such an inference is inconsistent

* *Cruise's Dig.*
*Tit* 21. c. 2. §
22—50.

with the principles of the *English* common law, and against the liberal policy of this country.

2. Again, it is said that none but an *episcopalian* could be elected a trustee, or rector. But after the adoption of the constitution of this state, no *episcopalian* could be elected, or inducted under the charter. Before the constitution was adopted, it was essential, that the rector or clergyman, should be inducted, by the governor of the state, pursuant to instructions from the king and council, or by the bishop of *London*. As the rights of the king, or bishop of *London*, in regard to the churches in this state, were destroyed by the revolution, it was impossible to carry the charter into effect. The trust, so far as it respected a clergyman of the church of *England*, ceased, and there remained only the trust as to a *school* and *fair*. By an act of the legislature, passed the 17th of *April*, 1784,* the charter of *Trinity* church, as it respected induction, was repealed. This act shows clearly the opinion of the legislature, that the charter, so far as it related to the induction of a clergyman of the church of *England*, could not, consistently with the constitution of the state, be carried into effect. The regulations of this act, however, were confined to the southern district. The constitution was left to have its full effect, on all the charters in the other parts of the state, which were not, it is probable, thought of sufficient importance, to induce an application to the legislature to revive the uses and trusts, as it respected the *episcopal* church. It is to be observed, also, that the legislature, by the act of 1784, in relation to *Trinity* church, recognized and confirmed the previous acts of the council, for the temporary government of the southern district, who, upon the petition of sundry persons, and to prevent dissensions, declared the places of the church-wardens and vestry-men vacant, and vested all the estate, real and personal, of the corporation, in certain persons named in the act.

Induction, in *England*, is an act done, *ex mandato* the archdeacon.† In this state, before the constitution,

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

* *Greenleaf's* ed. of the *Laws* of *N. Y.* v. 1. p. 95.

† *Cruise's Dig.* Tit. 21. c. 2. § 18.

it was an act done according to a *mandate* from the king to the governor. Who became the heirs and successors of the crown, in relation to the right of induction ? As the governor had a right to induct by command of the king only, surely, this right could not have vested in the church-wardens and vestry-men at *Newburgh*.

3. It is said, that the act of 1803, was unconstitutional, or passed under a mistake, as to the rights of the plaintiffs. We contend that the act was constitutional, and as it granted the land to the trustees, under whom the defendant claims, it is conclusive in this cause. It has been already shown, that by the revolution, and constitution of this state, the trusts and uses of the charter, as it respected a minister of the church of *England*, became extinct. The only trust or use remaining, was in relation to a *school* and a *fair*, or *market ;* and in regard to these objects, all the inhabitants, without regard to religious distinctions, were interested, and had a right to vote in the choice of trustees, and to petition the legislature. No rights have been infringed. The act makes no new law ; it provides, that if, at any time thereafter, a minister of the *episcopal* church should be inducted, as near as may be, according to the charter, that the trustees of the glebe should pay to him, annually, a reasonable proportion of the monies arising from the lands, according to the true intent of the charter. The act was, therefore, wise and beneficial. It gave effect to the existing trust or use, as to a *school*, under the charter, and left the other use, as it regarded a minister, untouched. There was no evidence of any surrender of the charter ; and the judge, at the trial, declined giving any opinion as to the effect of any misrepresentation to the legislature. The legislature had a right to vest the estate without a surrender. An estate may be made to cease by statute,* and to pass and vest, in a manner different from what it could by the common law.† The power of the legislature is unlimited, except by the constitution. It may take the property of A. and grant it to B. though it is bound, undoubtedly, in justice and honour, to make full compen-

* *Bac. Ab. Statute* (E.) 6 *Rep.* 40 *Mildmay's* case, *Cro. Eliz.* 379.
† 1 *Lev.* 75. *T. Raym.* 355. 2 *Inst.* 4th par. 36.

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

sation to A. but whether this be done or not, the grant to B. is, nevertheless, valid. In relation to the rights of property, the legislature is supreme and uncontroulable. Without wishing to extend the powers of the legislature, we must say, that when the legislature have enacted what is not forbidden by the constitution, courts of justice must bend and bow before the law. No court has power to pronounce such an act void. The doctrine, that a law against natural justice is no law, may be true in theory, but in experience and practice, it is otherwise. But even in such case, the injustice must be gross and palpable. What shall we say of the bills of attainder, passed during the late war, by which the estates of persons were forfeited and taken away, without a trial, when the parties were absent and unheard? It is true, that since the constitution of the *United States*, no such bills can again be passed; but this court has never questioned the validity of those acts. So the charter of the corporation of the city of *New-York*, has been altered by an act of the legislature. Again, it is a maxim of law, and of justice, that no man ought to be a judge in his own cause; yet, by an act of the legislature, the mayor's court of this city, consisting of the mayor, recorder and aldermen, are empowered to take cognizance of causes, in which the corporation are parties, in relation to private property, and the regulation of streets. Yet the validity of this act has never been called in question. It has been said, that when the act of 1803 was passed, there were no trustees; if so, then the rights of no person have been infringed.

4. *Cave Jones*, the minister elected in 1805, cannot maintain this action. He had not the legal estate, nor was he the *cestui que use*. The use was executed in the trustees, not in *Jones*. It could not be executed in *Jones*, for a use cannot be executed, unless there be a person seised to the use of another.* Now, the trustees being a corporation, cannot be seised to a use.† It was, in fact, a trust at common law, or use executed in the trus-

* 1 *Cruise's Dig.* 422. Tit. 9. c. 3. § 7.
† *Ibid.* 423. 1 *Co.* 122 a 126 a. *Dyer,* 283 a.

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

* 1 *Cruise's Dig.*
462, 463.

tees, by the statute.* The trustees had power to grant leases, and no other person could exercise that power. A *parson*, in *England*, is a corporation sole, and is seised of the freehold. Here the rector is not a corporation sole, nor is he seised of the freehold. The trustees had no right to locate the two hundred acres, for the exclusive benefit of a clergyman ; ·for the charter gives it for the joint object of a minister and a *school.* It is clear, therefore, that *Cave Jones* had no legal estate ; he was in possession, neither under the old charter, nor the new incorporation. He was neither inducted according to the charter, nor according to the act of the legislature, relative to religious incorporations. Again, the new religious corporation, can claim nothing under the old corporation. There is no privity between them, no legal succession or inheritance, by which the rights, or property of the one, can be transmitted to the other. The trustees elected under the new incorporation, could not be the lessors of the plaintiff, for the act of 1803, had vested the estate in others, in order to carry into effect the remaining trusts of the charter.

*Benson*, in reply. According to the charter, the trustees had the power, and it was their duty, to assign 200 acres of the land, for the use of a minister. They, in fact, assigned 100 acres, as a glebe, and the assignment of that quantity for a glebe, is to be presumed to have continued as a practice and usage, under the charter, from 1752 to 1775. *Walsh* and *Dodge*, who called themselves trustees, in 1803, ground their petition to the legislature, on the fact that there was no minister. Now, if they were trustees, it was their duty to call a minister. But, in truth, they were not legal trustees under the charter. Under the original grant to the palatines, all the corporators must have been *Lutherans ;·* so, under the new charter, all the corporators must have been *episcopalians.* There is no analogy between an *advowson*,· according to the *English* law, and this charter. An *advowson* is property, which may be sold, or aliened in fee, for life or for years, and will descend,

like any other estate. The *patron* may exercise the right of presentation, or not, at his pleasure. In the present case, the trustees could not sell, or transfer the rights given them, under this charter. They were bound to fulfil their trust, and might be compelled to execute it, in case of neglect or refusal. It is not to be presumed, that it was intended, that the grant should confer a power, by which its object might be wholly defeated: on the contrary, it must be intended, that the right of election was to be confined to such as were episcopalians.

The act of 1803, provides, that as soon as a minister shall be inducted, as near as may be, according to the charter, the trustees shall pay a part of the money, for the use of the minister, according to the intent of the charter. The word *inducted*, is used in a popular sense ; that is, where a person is duly called, and elected a minister, by the trustees, or church-wardens and vestry. The term *induction*, in the sense in which it is used in the *English* law, is not applicable to this country ; though there is some formal and symbolical act of giving possession of the church, by the church-wardens and vestry. The governor of the state, certainly, never went, in person, to induct clergymen, under a mandate from the king, as has been supposed. The charter of 1752, was a good grant: It did not cease to exist, because no trustees were elected. The act of 1803, recognizes the existence of the charter, and authorises an induction as near as may be, according to the charter ; *Cave Jones* was, in fact, inducted as near as might be, according to the charter. If all the formalities prescribed in old charters, were required to be rigidly and strictly observed, many of them might be defeated.

As to the power of the legislature, to pass the act in question, that is a point for the court to determine, or not, in their discretion. Yet, would it not be proper to consider all private acts of the legislature, in relation to property, as grants, and to be avoided, when obtained by fraud or false suggestions ? In *England*, so many precautions have

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

been adopted, in passing private acts, that it is scarcely pos-sible, that the parliament should be imposed on. The consent of all parties in being, and capable of consenting, how-ever remote their interest may be, in the property to be affected, is always required.   The bill is either referred to two judges, or to a committee, before whom, all the re-citals and allegations, are as fully examined and proved, as they would be on a trial in ejectment ; and, after the bill is reported, and committed in the house, new evidence is again produced ; and the same course is observed in both houses ; and a general saving clause, is usually added, as to the rights of all persons, except those consenting, or named in the act.   And it has been held, by the *English* courts, that a private act of parliament does not bind strangers, and may be relieved against, if obtained upon fraudulent suggestions.*   It must be competent, then, to this court, to decide, in relation to all private acts, whether they have been obtained by fraud and imposition.

* 4 *Cruise's Dig.*
*Tit.* 33. § 23. 31.
49. 53.  2 *Black.*
*Comm.* 345.
*Hargrave's jur.*
*arg.* v. 2. p. 392.

The act of the legislature, in regard to the charter of *Trinity* church, arose out of the times, and can be excused only by the necessity, and peculiar circum-stances, existing at the close of the revolution.   It fur-nished no authority, or precedent, for subsequent legisla-tures, in a settled and established order of things.

The trustees, having set apart 100 acres of land, as a glebe, for the use of a minister, as soon as a minister was duly inducted, he became seised of the glebe, and was capable of maintaining an action for its possession.   It is sufficient that he has been elected, and inducted, as near as may be, pursuant to the charter.   Had not the legisla-ture declared, that such an election, or induction, should be valid, a court of chancery would not have suffered the rights, under this charter, to be lost, or defeated, not by any act or neglect of the parties, but by the events of a revolution ; but would have interposed and directed, that they should be exercised, *as near as may be*, according to the charter.

VAN NESS, J. On the argument, several nice and delicate questions were raised for our decision. The property in dispute is understood to be valuable, and being appropriated for religious and other beneficial public purposes, it is desirable that a compromise should be effected between the parties, upon principles of mutual concession, whereby the ends of the original grant may, in some way, be attained. My opinion will leave the door to compromise open, and if the parties shall not avail themselves of this opportunity to adjust the controversy, by amicable arrangement among themselves, they must abide the consequences of such decisions as the court shall, in the course of future litigation, feel itself bound to pronounce.

The lessors of the plaintiff found their right to a recovery, upon the legality and validity of the election of trustees, in *November*, 1805, conducted, as they contend, in conformity to the original charter. They deny the right of the legislature to make the law of 1803 ; but even conceding that the legislature had the right, they allege that the law was obtained by fraud and misrepresentation, and ought, therefore, to be avoided.

The defendant denies the legality of the election of 1805, inasmuch as episcopalians, exclusively, were permitted to vote thereat. But, admitting that the charter gave to episcopalians only the right to vote, he says, that the act of 1803 has altered and modified the charter, and that he derives his possession from the trustees chosen pursuant to that act.

The trustees of the parish of *Newburgh* are a body corporate, and it is taken for granted, on all hands, that the title to the land in controversy is vested in that corporation, or those claiming under it. And, in my view of the subject, the only question presented by the case is, who are the members composing this corporation.

To determine that question, the counsel on both sides have proceeded on the idea, that a decision as to the validity of one or both of the elections of trustees, is necessarily involved. I think differently. The question

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

in this action is not, who are the trustees *de jure*, but who are the trustees *de facto*. As long as the conflicting claims of these different sets of trustees, both elected under colour of right, to the exercise of the corporate rights, remain undetermined, so long the possessions held under either, ought not to be disturbed. I am satisfied, that in the present suit, these claims cannot be tried. If an inquiry into the qualifications of the persons who were permitted to vote at the election of 1805, can be made, the same inquiry is equally proper, as to the qualification of those who voted at the election of 1803. In fact, the regularity of every part of the elections would be open to investigation. This would be, not only an unprecedented mode of proceeding, but contrary, in my opinion, to known and well settled rules.

The defendant is in possession, *under the trustees elected pursuant to the act of* 1803. I intend, that he is in possession under a lease, sealed with the corporate seal; and those trustees, as it respects this portion, at least, of the lands belonging to the corporation, must be regarded as the trustees *de facto*. They were elected *before* the other set of trustees, under an existing law of the legislature, and until they are ousted, the court is bound to protect the possession of their tenant.

The only way in which the legality and regularity of these elections can be settled, is by *information*, in the nature of *quo warranto*, under our statute. This is the appropriate remedy, in all cases of contested corporation elections; and either of the present parties may resort to it, to have their rights fully investigated, and finally determined.

Until it shall have been determined by this mode of proceeding, who are the rightful and legitimate representatives of the corporation, I shall be unwilling to disturb the possessions of either of the parties. My opinion, accordingly, is, that a new trial ought to be denied.

SPENCER, J. The plaintiff having been nonsuited at the trial, it becomes a question, whether a title has been deduced under either of the demises. The first demise is from the religious incorporation, formed under the statute, on the 4th *November*, 1805, and their title is supposed to have commenced, at the time of the incorporation, and to extend to such real estate, as the original trustees, *Colden* and *Albertson*, held under the grant, of the 26th *March*, 1752. Upon the principles of the common law, this religious incorporation could take such property only, as had been granted to it, by its corporate style, and not being *in esse*, when the first grant was made, it could not acquire any interest by relation. If, therefore, it became invested with any property in the lands granted to *Colden* and *Albertson*, it can only be under the provisions of the general statute. To acquire a title by that statute, it is necessary, that the grant should have been to the corporation, to the congregation, or society, or to *Colden* and *Albertson*, for their use. By a reference to the charter, it will be seen, that although *Colden* and *Albertson* were trustees, they were not trustees exclusively, for the benefit of that society, but for the benefit of a minister of the church of *England*, and a schoolmaster, in the proportion which the trustees shall think meet and convenient; so that the trustees had a discretionary controul over the fund, the profits of which they could distribute, as they saw proper. It appears to me, that under the charter, therefore, it cannot be contended, that the corporation acquired any legal interest in the land itself, they not being *cestui que trusts*, for the entirety, nor for any definite proportion of it.

The second and third demises, involve the same question, except so far as respects *Cave Jones*, and that is, whether the election of the 4th *November*, 1805, was a valid election, and conferred on the lessors, the legal estate to the lands in controversy. The case states, that a large majority of the inhabitants, of the *German* patent, who assembled to vote, were not episcopalians, and for

ALBANY,
Feb. 1808.

Jackson
v.
Nestles.

this reason only, their votes were refused, and that none but episcopalians, who did not compose one-tenth part of the inhabitants, were allowed to vote at that election. The right of election is expressly given, by the charter, to all the male inhabitants of the *German* patent, who are above the age of twenty-one years. The trustees, when elected, have the disposal of the revenues of the glebe, and are to distribute them, as they think meet, between the minister and schoolmaster ; the minister is required, by the charter, to be of the church of *England*, and has the care of souls of all the inhabitants on the patent, whilst the schoolmaster may be of any religious denomination, and it is his duty to instruct the children of all the inhabitants.

From this statement, it would seem to me, most conclusively, that no court of law, called upon to pronounce, not to make the law, can hesitate in saying, that all the inhabitants of the *German* patent, have an important right, secured to them by the charter, of electing trustees, to make, not only the selection of a schoolmaster, but to decide on his salary. Of this right, they ought not to be deprived, from a supposed inconsistency, that persons of various religions, may, under the words of the charter, interfere in the choice of an episcopalian clergyman, or may be averse to the employment of one of that order.

It must have been foreseen, when the charter was granted, that there would be persons of different modes of religious worship on the *German* patent ; yet, still, they were to be admitted to a participation in the elections. It cannot be requisite to advert to other parts of the charter, to enforce the propriety of the opinion I have formed ; if it was necessary, my opinion would receive additional force, from that part of the charter which enables the trustees to hold fairs, in which, as well as in the choice of a schoolmaster, all the inhabitants have a vested interest, by the charter, and consequently, cannot, and ought not, to be deprived of the right of choosing their trustees, on the propriety, and

fidelity of whose conduct, their rights, in a great measure, depend.

With respect to the demise from *Cave Jones*, there is no pretence to say, that he acquired any legal title to any portion of the lands, under his induction and settlement. The only claim he had, was to such part of the revenues of the glebe, as the trustees thought proper to give him.

The plaintiff having failed to show any title, the defendant cannot be disturbed in his possession. This view of the case, renders it unnecessary to consider the objections raised to the act of the 6th *April*, 1803. My attention has not been particularly directed to the consideration, whether the legality of the election of trustees, can be tried in this collateral way, inasmuch as both parties have considered the validity of the election of *November*, 1805, fairly before the court, without any objection to the manner in which it has been presented. In my opinion, the nonsuit ought to be confirmed ; and that, consequently, the plaintiff must take nothing by his motion.

KENT, Ch. J. and THOMPSON, J. having been absent, from indisposition, on the argument of the cause, gave no opinion.

Rule refused.